People v Garcia (2025 NY Slip Op 51241(U))

[*1]

People v Garcia

2025 NY Slip Op 51241(U)

Decided on August 5, 2025

Supreme Court, Bronx County

Busching, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on August 5, 2025
Supreme Court, Bronx County

The People of the State of New York
against
Andrew Garcia, Defendant.

Ind No. 1017-2020

Assistant District Attorney: Johnathan Vega
Defense Counsel: John M. Cromwell

Laurence E. Busching, J.

The defendant is charged with Sex Trafficking of a Child and related offenses. He has moved to dismiss the indictment, pursuant to Criminal Procedure Law (hereinafter "CPL") 30.30(1), alleging that the People should be charged for speedy trial time from the filing of the indictment on December 3, 2020, until his arraignment on March 18, 2024. The People assert that this entire time is excludable from speedy trial calculations.
On December 3, 2020, the People filed the instant indictment, and an arrest warrant was issued for the defendant by the Honorable Alvin Yearwood. The defendant was returned on the warrant on March 12, 2024, after he was arrested on unrelated charges of Criminal Possession of Stolen Property and other offenses.
To resolve the question of whether to charge the People with the speedy trial time between filing of the indictment and the defendant's arraignment, the Court ordered a hearing to determine whether during the period at issue the People could establish the defendant was "absent" or "unavailable" as defined in CPL 30.30(4)(c)(1). 
In reaching its determination, the Court has reviewed the defendant's omnibus motion, the People's response, the Court's decision ordering the hearing, the hearing testimony and exhibits, both sides' post-hearing briefs, the court file, and applicable case law. For the reasons stated below, I find that the People have met their burden and therefore deny the defendant's motion to dismiss.
Findings of Fact:
Det. Dennis Regimbal of the Joint Human Trafficking Task Force conducted the investigation of this case and arrested eight co-defendants on post-indictment arrest warrants in a "take down" on December 23, 2020. The defendant was not arrested on his arrest warrant until March 12, 2024.
Det. Regimbal testified that prior to the filing of the indictment and issuance of the arrest warrants, "an extensive number" of search warrants were issued for cellular phones, social media accounts, and iCloud accounts. More than 30 subpoenas were issued.
Det. Regimbal also participated in a parole visit to co-defendant Angel Cano's apartment at 882 Bryant Avenue in October 2020 and observed the defendant to be present. Over several days' surveillance, Det. Regimbal observed the defendant at the Bryant Avenue address during the early morning hours, most recently a few days before the arrests of the other defendants on December 23, 2020.
Based on these experiences, and multiple witness interviews, Det. Regimbal believed that 882 Bryant Avenue was the defendant's residence, although, for reasons not made clear, 2309 Haviland Avenue was the address listed for the defendant on the arrest warrant.
On December 23, 2020, Det. Regimbal went with other detectives to 882 Bryant Avenue to arrest the defendants and execute a search warrant. Other members of his squad went to 2309 Haviland Avenue. Other police went to a third location, the home of a woman believed to be the defendant's girlfriend. She had been identified as one of the victims in the charges in the indictment. The defendant could not be found at any of these locations.
The arrest warrant for the defendant, as with those for the other defendants, was uploaded to the national NCIC database. A travel alert was also put in place in the event the defendant attempted to travel internationally. His information was uploaded to SafeTNet and DEX, both of which would alert any law enforcement agencies coming across the defendant during an investigation that they should contact Det. Regimbal.
Following the arrests of the other defendants, news articles appeared describing the case, the charges, and the individuals arrested. Several such articles were admitted into evidence.
During the initial investigation, Det. Regimbal and his team became aware of several social media accounts connected to the defendant. However, after the arrests of his co-defendants and publication of the new articles, these accounts were deactivated.
In the weeks after the arrests of the other defendants, Det. Regimbal's team continued to surveil residences and other addresses connected to the defendant. They alerted the warrant squad. Det. Regimbal conducted interviews of people connected to the defendant to ascertain his whereabouts, including the defendant's girlfriend and her mother.
At the time of the issuance of the arrest warrant in this case, the defendant had multiple other open cases pending in Criminal Court. By the time of his apprehension in 2024, he had an open bench warrant on one court case and a pending I-card (indicating that a detective was looking for him) on another unrelated matter. 
In July 2021, Det. Regimbal received a call from a man who identified himself as the father or stepfather of the defendant. The caller said he knew that the defendant had a warrant for his arrest, and he asked what it was for. Det. Regimbal informed the caller that it was for Sex [*2]Trafficking and that the defendant needed to turn himself in. The caller said he had not seen or heard from the defendant, but that if he were in contact, he would relay the information. Det. Regimbal did not attempt to identify the location of the caller or "trace" where the call came from.
In 2022, co-defendant Ashley Garcia informed Det. Regimbal that the defendant was out of state, possibly in Florida, and a database check connected him with a Georgia address. Garcia also informed Det. Regimbal that the defendant knew he was wanted, based on having been told that by the person that was believed to be his girlfriend. Although he had a specific address in Georgia that may have been linked to the defendant via the database check, Det. Regimbal did not attempt to have local authorities investigate.
The defendant's mother, Lillian Cuevas, testified as a defense witness at the hearing. She testified that she and her family live at 2309 Haviland Avenue. Her son lived with her at that address prior to turning twenty, and he is now twenty-eight. In December 2020, he resided with his girlfriend Danielle, although she did not know Danielle's address. She later explained that in 2020-2024, the defendant did not have a steady place where he lived: "Sometimes he stayed with Dad. Sometimes he would stay with me. It all depends." She also stated that she did not know where the defendant's father, Miguel Garcia, lived. To her knowledge, her son never left the Bronx.
Ms. Cuevas testified that in late December 2020, uniformed officers came to her home and asked for her son. She informed them that he did not live there, "although this is his address." She asked her son about why the police were looking for him, and he answered that it was nothing and that he would take care of it.
The defense moved into evidence six photographs of Ms. Cuevas's family from 2022 and 2023. Three of the photographs are from a family get-together in her home. The other photographs were downloaded from an Instagram account. In one of those photographs, the defendant is depicted in a black car, which Ms. Cuevas called "his Camaro." After initially saying she did not know whose account the photographs were recovered from, Ms. Cuevas later testified that they were from his Instagram account.
In the photographs that were posted to the defendant's Instagram account in 2022 and 2023, his face was purposely obscured. In contrast, there are earlier posts and videos where his face was not obscured.
On March 11, 2024, Police Officer Bryan Moran, of the 43rd Precinct, and other officers pursued a black Camaro that was reported to have committed a traffic infraction. When the officers went to stop the vehicle, Officer Moran observed it being driven at a high speed, "wrong way, on the runways, on the sidewalk." The car had tinted windows, and the officers were unable to identify who was driving the vehicle. Eventually, the pursuit was called off by supervisors, but the police obtained the license plate from the front bumper, which fell off during the pursuit.
Using "LPR cameras," the officers identified an area in the precinct where the Camaro [*3]had been on previous occasions and began canvassing that area. Two officers found the car unoccupied, so the police continued to monitor the car. Several hours later, Officer Moran and his partner passed by and saw that the defendant was sitting in the Camaro's driver's seat.
When the officers got out of their police car and approached, the defendant left the Camaro and started walking away. The officers approached him and asked about the car. The defendant replied that it was not his. Instead, he claimed he entered the car looking for "change" or "clothes," even though he appeared to be neatly dressed. The officers ran the VIN number of the Camaro and discovered that it had been reported as stolen shortly after the previous night's chase with police. The officers then went to arrest the defendant for Criminal Possession of Stolen Property, but he started running. "He crossed the highway, he jumped from the highway, luckily we were able to see the area where he went behind the homes," Officer Moran explained.
Officer Moran radioed a description of the defendant, and responding officers came across him on Chatterton Avenue. He continued to run from the police and even avoided an officer's deployment of a taser. Eventually, officers were able to place the defendant in handcuffs. Upon his arrest, the defendant gave the address of 2309 Haviland Avenue.
In processing the arrest, Officer Moran asked the defendant his name, to which he replied, "Stephen Figueroa." Based on his review of a photograph from a prior arrest in their computer system, Officer Moran suspected this to be false. The defendant also gave two different dates of birth. Officer Moran asked the defendant, "is that the name you're going to stick with?" The defendant replied yes. After sending the fingerprints "to Albany," Officer Moran was informed that the name did not match the prints and pedigree information given, and that he should fingerprint the defendant again. Officer Moran did so and received a response that the defendant's true name was Andrew Garcia. Officer Moran determined that the defendant was wanted on both an open bench warrant from Criminal Court and an NYPD I-card, in addition to the arrest warrant for this case.
The parties stipulated that Stephen Figueroa is the defendant's brother.
Conclusions of Law:
When an accused is charged with a felony, the People have six months from the commencement of the criminal action within which to communicate their readiness for trial in satisfaction of their speedy trial obligation under CPL 30.30(1)(a). (People v Rhee, 111 AD2d 655 [1st Dept 1985]).
On a speedy trial motion, the defendant has the burden of demonstrating a delay greater than six months. Once the defendant has met this threshold, the People have the burden of showing that certain periods should be excluded. (People v Santos, 68 NY2d 859 [1986]; People v. Berkowitz, 50 NY2d 333 [1980]).
CPL 30.30(4)(c)(i) mandates that time must be excluded from speedy trial calculations when the defendant is absent or unavailable: "[a] defendant must be considered absent whenever [*4]his location is unknown and he is attempting to avoid apprehension or prosecution, or his location cannot be determined by due diligence." (emphasis added).
At the start of the hearing, the People advised that they were proceeding only under the theory that the defendant's location was unknown and he was avoiding prosecution, rather than the theory that his location could not be determined by due diligence. Nevertheless, at the hearing, both sides questioned extensively on the arresting detective's efforts to locate the defendant during the time between the filing of the indictment and his eventual apprehension, and in their post-hearing briefs, both sides addressed whether this constituted "due diligence." 
Turning first to the question of whether the defendant's location was unknown during this period, Det. Regimbal's testimony established that during the investigation of this case, he was able to link several addresses to the defendant. These included his family home, the residence of co-defendant Angel Cano, and that of the defendant's girlfriend, who was considered a victim of several of the charges in this case. Upon executing the "take down" in this case, in which all other eight defendants were arrested, Det. Regimbal and other investigators were unable to locate the defendant. In the months and years that followed, they remained unable to ascertain where the defendant was despite reasonable efforts to do so. Det. Regimbal also confirmed that various alerts were put in place so that if the defendant were to encounter law enforcement, he would be apprehended.
While the defense claims that the defendant resided at the family home during this period, this assertion is refuted by his mother's testimony and the evidence from the hearing. Ms. Cuevas testified that even she did not know where he resided during the period of 2020-2024, describing him as moving between several residences. These included the residences of the defendant's father and his girlfriend, the locations of which she claimed not to know.
During this period, the defendant made extensive efforts to evade apprehension and prosecution, including avoiding locations known to law enforcement, absconding on his open cases, taking down his social media that was known to law enforcement, and obscuring his image on an Instagram account. As all these actions occurred after the arrest of the eight co-defendants, reporting of the case in the media, and various law enforcement contacts with the defendant's family, it is reasonable to infer that the defendant was aware that he was wanted in connection with this case and intentionally eluding arrest and prosecution.
The defendant's actions on the day of his apprehension further support the conclusion that he was avoiding apprehension. After being seen inside a black Camaro that had recently been involved in a police chase, and shortly thereafter reported stolen by his girlfriend,[FN1]
the defendant gave evasive and patently incredible answers to the police. Upon further questioning, he fled from police, making vigorous efforts to avoid capture. Once in custody, he persistently gave a false name. These actions were extreme in view of the relatively benign situation which confronted the defendant at the time of his interaction with the police and support the view that [*5]he was highly motivated and engaged in avoiding apprehension on this matter.
In view of the above, the Court concludes that the defendant's whereabouts were unknown and that he was attempting to avoid prosecution or apprehension. (See People v Providence, 216 AD2d 75 [1st Dept 1995] lv denied, 86 NY2d 800) (defendant's mother confirmed that he was not residing at either his reported primary or alternate address; he then used an alias at the time of his apprehension and failed to appear at arraignment). Under these circumstances, the People were not required to show due diligence in apprehending him. (See People v Bolden, 81 NY2d 146 [1993]). Therefore, the period between December 23, 2020 and March 12, 2024 is excludable from speedy trial calculations, pursuant to CPL 30.30(4)(c)(1). 
Alternatively, the Court holds that the police efforts were sufficient to establish that the defendant's whereabouts could not be determined through due diligence. The evidence established, among other things, that the police surveilled various locations associated with the defendant prior to the take down; that on the day of the take down, the defendant was not at any of those locations; that subsequent inquiries were unproductive; that in the years between the take down and his eventual apprehension, the defendant moved among various residences such that no clear location was ever established; that police continued to make reasonable inquiries, including of his mother, girlfriend and a co-defendant during this time; that the police established a system of alerts that would be triggered if he were to come into contact with law enforcement or attempt to leave the country; that they made preparations for his surrender after being contacted by his father (or stepfather); that the defendant made efforts to prevent or limit his online presence after the take down occurred; and that at the time of his eventual apprehension defendant made strenuous efforts to avoid apprehension and eventual identification. Although the defense pointed out additional steps that the police may have taken to further the investigation, "the police are not obligated to search for a defendant indefinitely, so long as they exhaust all reasonable leads as to his whereabouts." (See People v Marrin, 187 AD2d 284, 286 [1st Dept 1992] lv denied 187 AD2d 284; People v Minwalkulet, 198 AD3d 1290 [4th Dept, 2021]).
For the reasons described above, the Court finds that the entire period from December 23, 2020 and March 12, 2024 excludable from the speedy trial calculations, and thus the defendant's motion to dismiss under CPL 30.30 is denied.
This constitutes the Decision and Order of the Court.
Bronx, New York
August 5, 2025
Laurence E. Busching, AJSC

Footnotes

Footnote 1:The defendant's mother testified the defendant had a black Camaro.